# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Delta County Parcel Number 345503300057, more<br>fully described in Attachment A, attached hereto, to<br>include all out-buildings, vehicles and persons on the<br>property. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 21-sw-720-GPG

## APPLICATION FOR A SEARCH WARRANT

I, Jason R. Greenfield, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the <u>State and</u> District of <u>Colorado</u>, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. 841 | Possession with the Intent to Distribute |
| Title 21 U.S.C. 846 | Conspiracy to Distribute a Controlled Substance |
| Title 18 U.S.C. 922 (g) | Felon in Possession of a firearm |
| Title 18 U.S.C. 924 (c) | Use of a Firearm in commission of a drug felony |

The application is based on these facts:

X   Continued on the attached affidavit, which is incorporated by reference.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Jason R. Greenfield*

SA Jason R. Greenfield DEA
*Printed name and title*

Sworn to before me and:   ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: _7/6/21_

City and state: __Grand Junction,__

*Judge's signature*
Gordon P. Gallagher-Magistrate Judge

## ATTACHMENT A
## Description of Location to be Searched

Delta County Parcel Number 345503300057 with a Situs address of 8277 and 8281 Highway 65, Delta, CO, 81416.

Description of Area: A parcel of land identified in Delta County Assessor records as Parcel Number 345503300057, Situs Address of 8277 and 8281 Highway 65, Delta, CO 81416 and owned by Constance Lynn Wilson of 36 Road 2380 Aztec, NM 87410.  The residence is a single-family home that is painted white has a red roof, and red or brown brick.  The residence has a concrete stairway leading to the front door. The residence has a long gravel driveway leading to the residence with a red signpost indicating 8277 and 8281 Highway 65, Delta, CO.

The search will include all persons, all rooms, attics, basements, and all other parts of the property, as well as surrounding grounds, garages, vehicles, storage rooms, or outbuildings of any kind, attached or unattached, and located thereon and under the dominion and control of the occupants of Delta County Parcel Number 345503300057 with a situs address of 8277 and 8281 Highway 65, Delta, CO 81416.



1





## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

Evidence, fruits, and/or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846; and Title 18, United States Code, Section 924(c), to include:

1.  Controlled substances, including but not limited to methamphetamine, heroin, cocaine and marijuana.

2.  Vessels or other implements used in connection with the production, packaging, weighing, storage, transport, or distribution of such controlled substances.

3.  Substances used to mix into controlled substances in order to create a larger volume. Such substances are commonly referred to as "cut."

4.  Books, receipts, notes, invoices, charge card and/or credit card statements and summaries, bank statements, records, correspondence, narcotics customer or supplier lists, growing schedules, logs, journals, contracts, shopping lists for food and supplies, letters, phone records, phone books, address books, notations and other papers, and any files or records relating to the cultivating, transporting, selling, storing, ordering, purchasing or distributing of controlled substances.

5.  Indicia related to occupancy, residency or ownership of property, premises, or vehicles, including, purchase or lease agreements, titles, keys, and mail envelopes.

6.  Weapons, firearms, and items used in conjunction with weapons or firearms, including magazines, ammunition and means of carrying or concealment and records or receipts pertaining to weapons, firearms and ammunition.

7.  Financial records, including expenses incurred in obtaining the equipment and items necessary for the cultivation and/or distribution of controlled substances, income derived from the sales of controlled substances, pay-owe sheets, records of legitimate income (to serve as a baseline to discern excess or unexplained income consistent with proceeds derived from drug trafficking) and general living expenses.

8.  United States currency, precious metals, jewelry and financial instruments, including mortgage notes, stocks, and/or bonds representing drug proceeds.

9.  Books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, certificates of deposits, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, correspondence, safe deposit keys, money wrappers, and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

10. Computers, cellular telephones, and/or portable telephones, pagers, and any stored electronic communications contained therein.

1

11. Devices used to communicate with other individuals involved in the manufacture and distribution of methamphetamine or any other controlled substance, including cellular telephones, radios, pagers, beepers and devices used to conduct counter surveillance against law enforcement, including scanners, surveillance cameras, night vision devices, FLIR devices, monitors, motion sensors and/or alarms, recording devices and/or receipts or literature describing the same.

12. Address and/or telephone books (written or typed by hand as opposed to printed commercially), indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

13. Photographs and digital images, including still photos, negatives, videotapes, films, undeveloped film and the contents therein, slides, in particular, photographs of co-conspirators, of assets and/or controlled substances.

14. Assigned telephone number for any and all telephone, cell phones and pagers found in the area, along with telephone toll records, papers, notebooks and other items documenting the purchase, acquisition or distribution of marijuana or any other controlled substance, and communications among co-conspirators.

15. Vehicles at the residence at the time of the search warrant execution.  Specifically, the seizure of the red 2019 Ram 1500 pickup bearing Colorado license plate BQSJ93 and registered to Lonny Hilbers of 8281 Highway 65, Delta, CO.

16. For the electronic devices (hereinafter COMPUTERS):

    a.  evidence of who used, owned, or controlled the COMPUTERS such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

    b.  evidence of software that may allow others to control the COMPUTERS, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the lack of such malicious software;

    d.  evidence of the attachment to the COMPUTERS of other storage devices or similar containers for electronic evidence;

    e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTERS;

    f.  evidence of the times the COMPUTERS were used;

2

g.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTERS;

h.  evidence indicating how and when the COMPUTERS were accessed or used to determine the chronological context of computer access, use, and events relating to the crime under investigation and to the computer user;

i.  contextual information necessary to understand the evidence described in this attachment;

j.  volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer;

k.  records and information, including texts, emails, photographs, or videos of or about controlled substances or people possessing, obtaining, distributing, or using controlled substances or holding firearms;

l.  records of or information about the COMPUTERS' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  information, notes, documents, records, photographs, videos, or correspondence, in any format and medium, pertaining to violations of Title 21, United States Code, Sections 841(a)(1).

n.  Items otherwise described in this attachment but contained on an electronic device of any sort.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

DEFINITIONS:

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as film, prints, videos, or photocopies).

3

As used above, the terms "computers" or "digital storage media" are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, network hardware, hard disks, RAM, flash memory, and other electronic storage media.

## USE OF INVESTIGATIVE OR PROTECTIVE ACTIVITY

This warrant authorizes officers to use an electronic technique to disrupt Wi-fi service to the locations identified in ATTACHMENT A on the date of execution of the warrant, prior to and during execution of the warrant.

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

I, Jason Greenfield, a Special Agent with the Drug Enforcement Administration (DEA), being duly sworn, do hereby depose and state as follows:

## PURPOSE OF THIS AFFIDAVIT

1.   This affidavit is submitted in support of a search and seizure warrant for private property located in Delta County, State of Colorado.  Based on my training, experience, and interactions with other law enforcement officers, there is probable cause to believe that evidence relating to violations of Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy to distribute, and to possess with intent to distribute methamphetamine) as well as Title 18 United States Code Sections 922 (g) and 924 (c), possession of a weapon by previous offender and use of a firearm in commission of a drug felony,  will be found at or near the following location in Mesa County, Colorado:

2.   Description of Area: A parcel of land identified in Delta County Assessor records as Parcel Number 345503300057 with a Situs address of 8277 and 8281 Highway 65, Delta, CO, 81416.

3.   The facts set forth in this affidavit are based on my direct participation in the investigation, personal observations, observations of other officers named herein, training and experience and information obtained from other witnesses and Law Enforcement Officers, including their incident reports.  This affidavit is intended to show that there is sufficient probable cause to search the locations identified herein and described more fully in Attachment A, incorporated herein by reference, and seize the items of evidence described herein and described in Attachment B, incorporated herein by reference, and does not purport to set forth all of my knowledge of, or the investigation into, this matter.  I have not included each and every

fact known to me concerning this investigation.  I have set forth only the facts that I believe are

necessary and applicable to establish the appropriate foundation of probable cause for the

issuance of a search warrant.  I have not purposely omitted any fact(s) that undermine or are

contrary to the opinions and conclusions set forth herein.

## INTRODUCTION AND AGENT BACKGROUND

4.      I, Jason Greenfield, am a Special Agent of the Drug Enforcement Administration,

Denver Field Division, Grand Junction Resident Office and am investigative or law enforcement

officer within the meaning of Title 18, United States code, Section 2510(7), and as such I am

empowered under Title 21, United States Code, section 878, to enforce Title 21 and other criminal

laws of the United States, to make arrests and obtain and execute search, seizure, and arrest

warrants. I have been a Special Agent for the DEA for approximately 15 years.  During my time

with DEA, I have participated in numerous drug trafficking investigations, including investigations

that have resulted in felony arrests for violations of Title 21 of the United States Code.  I have been

involved in various types of electronic surveillance, in the execution of search and arrest warrants,

and in the debriefing of defendants, witnesses, and informants, as well as others who have

knowledge of the distribution and transportation of controlled substances, and of the laundering and

concealing of proceeds from controlled substance trafficking. I have been involved with this

particular investigation since approximately April of 2021.

5.   Based on my training and experience, and further based on discussions with fellow law

enforcement agents with personal experience in the areas of drug enforcement, I am aware that it

is common for drug traffickers to:

  a.      Maintain controlled substances within their residences and other buildings on their

  property, for control and easy access for distribution;

b.      Keep books, records, receipts, notes, ledgers, airline tickets, bank records, money orders, and other papers relating to the manufacture, importation, transportation, and distribution of illegal controlled substances.  These individuals commonly front (provide on consignment) illegal controlled substances to their clients and thus keep some type of records concerning monies owed.  The aforementioned books, records, receipts, notes, ledgers, airline tickets, bank records, money orders, etc., are maintained where the narcotics trafficker has ready access to them such as his/her person, his/her residences and offices, in his/her motor vehicles or place of operation, or in storage facilities;

c.      Secrete contraband, precursor chemicals and glassware, proceeds of drug sales, and records of illicit drug transactions in secure locations within their residences, businesses, properties, automobiles, and within rented storage units for ready access and to conceal same from law enforcement authorities;

d.      Conceal in residences, businesses, properties, automobiles, and within rented storage units, caches of drugs, currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in illicit drug trafficking activities;

e.      Keep books, papers, and electronic devices (computers, electronic Rolodexes, caller ID devices, pagers, and cellular telephones) which reflect names, addresses and/or telephone numbers of their clients and associates in the illicit drug trafficking organization;

f.      Photograph themselves, their associates, their property, and their operations and the controlled substances, and that these traffickers usually keep these photographs in their possession;

g.      Keep paraphernalia for manufacturing, importing, packaging, weighing, and distributing narcotics that include, but are not limited to, glassware, precursor chemicals, scales, plastic bags, and other packaging materials;

h.      Utilize telephones, cellular telephones, digital pagers, utilities, automobiles, motel rooms, apartments, houses, and storage units which have been obtained by third parties (straw purchasers) or obtained in false names to hinder law enforcement investigations and to avoid seizure laws;

i.      Keep handguns, assault rifles, ammunition, and other weapons in their residences, businesses, automobiles, and storage units to safeguard supplies of drugs and the fruits of narcotics dealings;

j.      Maintain various types of records, to include books, receipts, bank records, computers with accounting software or data, drug ledgers, and other items that document drug trafficking transactions and money laundering;

k.      Keep large amounts of U.S. Currency, both to store the proceeds of illegal drug trafficking, and to maintain and finance their ongoing drug trafficking and money laundering activities; and

l.      Attempt to legitimize these profits through foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, and business fronts.

## PROBABLE CAUSE

6.      In April of 2021, agents from DEA along with the Seventh Judicial District Drug Task Force (SJDDTF) and Detectives from Delta SO and Delta PD received information regarding a methamphetamine dealer in Delta, CO identified as Lonny Hilbers. Agents received information from a SJDDTF confidential source, hereinafter referred to as CS-1. CS-1 informed agents that Hilbers was living at a residence located at 8281 Highway 65, Delta, CO (TARGET RESIDENCE). CS-1 further advised that Hilbers was capable of supplying quarter pound quantities or more of methamphetamine.

7.      Based upon the information provided by CS-1, agents verified that Hilbers was living at 8281 Highway 65, Delta, CO. Agents also learned that Hilbers had an extensive criminal history and was currently on parole with the State of Colorado for dangerous drugs.

### April 30, 2021 Controlled Purchase of Methamphetamine

8.      On April 30, 2021, at approximately 1:30 pm, agents met with CS-1 in order to prepare for a controlled purchase of methamphetamine from Hilbers. SA Flanagan conducted a debriefing of CS-1 at this time. CS-1 stated that he/she had recently seen Hilbers and that Hilbers had stated he would sell firearms to CS-1. Hilbers provided prices to CS-1 of $1300 for an SKS, $1300 for a Mini 14, and $1000 for a fully automatic rifle. Hilbers had shown CS-1 photographs of these weapons. In addition, CS-1 stated that he/she believed that Hilbers would travel in order to get a resupply of drugs after CS-1 purchased drugs from him. CS-1 showed SA Flanagan a contact in CS-1's phone which had the phone number of 970-250-9086 which CS-1 indicated belonged to Hilbers. Agents assisted CS-1 in placing a recorded call to this number. During this call, CS-1 asked the user of 970-250-9086 if he/she could come by, to which the user instructed CS-1 to "come by."

9.      Based upon the controlled purchase and speaking with CS-1 I believe that "come by" meant to go to Hilbers' residence at 8281 Highway 65, Delta, CO (TARGET RESIDENCE).

10.      SA Greenfield searched CS-1's vehicle for weapons, drugs, and cash as observed by DTF Supervisor Brian Rumbaugh. SA Greenfield found $22 in US currency and two utility knives in CS-1's vehicle. These items were secured by agents until the end of the controlled purchase operation. SA Flanagan searched CS-1 for weapons, drugs, and cash as witnessed by DCSO Detective Matt Brewer. This search was met with negative results. SA Flanagan outfitted CS-1 with a covert recording and transmitting device. SA Flanagan also outfitted CS-1 with a non-transmitting covert recording device. DTF Supervisor Rumbaugh provided CS-1 with $1500 in official funds. SA Greenfield gave final admonishments and reviewed danger signals with CS-1.

11.      At approximately 1:55 pm, CS-1 departed the neutral location followed by agents. Agents followed CS-1 to the residence of 8281 Highway 65, Delta, CO (TARGET RESIDENCE). Agents observed Hilbers' Ram 1500 parked at the residence at this time.

12.      At approximately 2:01 pm, CS-1 entered the TARGET RESIDENCE as observed by Delta PD detective Clint Swope. At approximately 2:03 pm, a white Toyota sedan arrived at the residence.

13.      At approximately 2:07 pm, CS-1 exited the TARGET RESIDENCE, entered CS-1's vehicle, and departed the area, followed by agents to a neutral location. CS-1 relinquished four clear plastic baggies of suspected methamphetamine which weighed approximately four ounces to SA Flanagan, who sealed it in an SSEE as witnessed by SA Greenfield. SA Flanagan conducted a debriefing of CS-1 at this time. SA Greenfield searched CS-1's vehicle for weapons, drugs, and money. This search met with negative results. The $22 in US currency and two

utility knives was returned to CS-1 at this time. SA Flanagan searched CS-1 for weapons, drugs, and contraband. This search was met with negative results.

14.     Subsequent to the purchase of the methamphetamine by CS-1, agents conducted a debriefing of CS-1. CS-1 stated that he/she had entered the house upon arriving. CS-1 stated that he/she purchased the methamphetamine from Hilbers in exchange for the $1500 in official funds. Agents assisted CS-1 in placing a recorded call to 970-250-9086. During this call, the user of 970-250-9086 stated that they would be "ready today" to supply more drugs to CS-1 (agents note: upon reviewing footage from the covert recording device, agents learned that the CS-1 had arranged a future controlled purchase with Hilbers). The operation was then terminated, and an additional controlled purchase was not conducted.

15.     I believe, based upon the above controlled purchase, surveillance by agents, debriefing CS-1, and reviewing the audio and video of the controlled purchase that Hilbers' utilizes his residence at 8281 Highway 65, Delta, CO to store methamphetamine as well as facilitate methamphetamine distribution.

**May 4, 2021 Controlled Purchase of Methamphetamine**

16.     On May 4, 2021, SAs Flanagan and Greenfield, assisted by DCSO Detectives Matt Brewer and Tyler Becker and Seventh Judicial District Task Force Supervisor (SJDDTF) Brian Rumbaugh, met with CS-1 in order to prepare for a controlled purchase. SA Flanagan conducted a debriefing of CS-1 at this time. CS-1 stated that there was no change to the price and quantity of the drugs. Agents assisted CS-1 in placing a recorded call to 970-250-9615. During this call, CS-1 provided the location to meet for the controlled purchase of methamphetamine to the user of 970-250-9615, to which the user responded, "text me the information and I'll be

there." SA Flanagan observed that CS-1 texted the meeting location information to 970-250-9615.

17.     SA Flanagan outfitted CS-1 with a covert recording and transmitting device. SA Flanagan also outfitted CS-1 with a non-transmitting covert recording device. DTF Supervisor Rumbaugh provided CS-1 with $1500 in official funds. SA Flanagan also provided CS-1 with $1500 of official advanced funds for a total of $3000.

18.     Agents established surveillance at Hilbers residence identified as 8281 Highway 65, Delta, CO (TARGET RESIDENCE) at this time. Agents observed a red Ram 1500 at this residence, known to be the primary vehicle of Hilbers.

19.     At approximately 2:22 pm, CS-1 departed the neutral location followed by agents. Agents followed CS-1 to a driveway of a residence on E 3rd St, Delta, CO. At approximately 2:29 pm, agents instructed CS-1 to travel to a secondary neutral location in order to resolve technical issues with the covert recording and transmitting device. Agents resolved this issue and instructed the CS-1 to return to the meeting location.

20.     At approximately 2:48 pm, Detective Clint Swope observed Hilbers' red Ram 1500 depart the TARGET RESIDENCE and travel south on Highway 65, towards Delta. At approximately 2:55 pm, TFO Watson observed as the red Ram 1500 arrived at the meet location. TFO Watson observed a white male with a shaved head and tattoos exit the vehicle and meet with CS-1, identified as Hilbers. TFO Watson observed that the red Ram bore a Colorado temporary license plate of 2920712. This temporary license plate registered to Lonny Len Hilbers on a 2019 red Ram 1500 pickup at 8281 highway 65, Delta, CO. At approximately 2:59 pm, TFO Watson observed Hilbers enter the red Ram 1500 and depart the location. Agents maintained surveillance of this vehicle.

21.     At approximately 2:59 pm, CS-1 departed the meet location and was followed by agents to a neutral location. CS-1 arrived at the neutral location at 3:05 pm. CS-1 relinquished the methamphetamine to SA Flanagan, who sealed it in an SSEE as witnessed by SA Greenfield. SA Flanagan conducted a debriefing of CS-1 at this time. SA Greenfield searched CS-1's vehicle for weapons, drugs, and money. This search was met with negative results. SA Flanagan searched CS-1 for weapons, drugs, and contraband. This search was met with negative results.

22.     At approximately 3:55 pm, agents observed the red Ram 1500 park near a business at 874 North Ave. Grand Junction, CO. Agents observed as Hilbers, and a white female, Haley Rhodes, exit the vehicle and enter a local vape shop. At approximately 4:05 pm, agents observed as Hilbers and Rhodes exited the business carrying plastic bags and entered Hilber's Ram 1500. The vehicle departed the location and returned to the area of Delta, CO. Agents terminated surveillance at this time.

23.     Agents conducted a post buy debrief of CS-1 regarding the transaction with Hilbers. SA Flanagan asked CS-1 if he/she knew the person that arrived in the red truck (2019 Ram 1500). SA Flanagan asked for this person's name, and CS-1 responded "Lonny Hilbers." CS-1 stated that there was a second individual in the red truck and identified this person as Haley Rhode. CS-1 stated that Hilbers had the drugs in a box for a personal pedicure machine. Hilbers gave the drugs to CS-1, and CS-1 gave the money to Hilbers. CS-1 stated that he/she had taken pictures of the firearms for sale using the covert transmitting and recording device.

24.     Based upon the above controlled purchase, surveillance of Hilbers, and the debriefing of CS-1, I believe that Hilbers departed his residence of 8281 Highway 65, Delta, CO and traveled to the meet with CS-1 utilizing his Ram 1500 in order to facilitate his drug trafficking activities. I further believe that the residence of 8281 Highway 65, Delta, CO is

Hilbers' primary residence and one in which he stores methamphetamine prior to distribution. Based upon surveillance agents did not observe Hilbers stop anywhere or meet with anyone prior to arriving at the meet location with CS-1.

### SURVEILLANCE OF TARGET RESIDENCE AND TARGET VEHICLE

25.     On May 19, 2021, Detective Matt Brewer obtained a State of Colorado warrant in order to place a GPS tracker on Hilbers' vehicle which is described as a 2019 Ram 1500 bearing CO license plate BQS-J93. The vehicle listed to Lonny Len Hilbers at 8281 Highway 65, Delta, CO.

26.     On June 2, 2021, agents initiated surveillance at approximately 10:30 am at 8281 Highway 65, Delta, CO. SA Greenfield observed only Hilbers' vehicle located at the residence.

27.     At approximately 11:00 am, SA Greenfield observed a gray four door sedan arrive at 8281 Highway 65, Delta, CO.

28.     At approximately 11:15 am, SA Greenfield observed as the gray four door sedan departed with what appeared to be one male occupant in the driver's seat. Agents were unable to obtain a license plate or conduct surveillance on this vehicle.

29.     At approximately 11:40 am, SA Greenfield observed as a matte gray Ford Focus hatchback arrived at 8281 Highway 65, Delta, CO.

30.     At approximately 11:48 am, SA Greenfield observed as the gray Ford Focus hatchback departed the residence with a single male occupant as the driver. Agents maintained surveillance of the Ford Focus as it traveled westbound on Highway 92 toward Delta, CO. Sgt. Brian Rumbaugh observed that the Ford Focus was bearing TX license plate NFH-4578 which listed to Beth Oard of 3308 CR 607, Alvarado, TX. Agents maintained surveillance of the Ford Focus hatchback until the vehicle arrived at a residence at the corner of 5th and Leon in Delta,

CO. Detective Brewer observed the male driver and believed the male driver to be Tyson

Quarles. At the residence, Sgt. Rumbaugh observed a vehicle bearing CO license plate XRO-839

which listed to Jessica Earl of 460 Leon St, Delta, CO.

31.     At approximately 12:50 pm, SA Greenfield observed as the red Ram 1500

departed 8281 Highway 65, Delta, CO (TARGET RESIDENCE). Agents maintained

surveillance as it traveled into Delta, CO and parked at the gas station by Wendy's at the corner

of Highway 50 and Highway 92. A short time later, Hilbers departed and began

traveling westbound under the bypass. SA Greenfield then observed as Hilbers made a U-turn

and began traveling back eastbound into Delta, CO. A short time later, Detective Brewer

observed Hilbers in the Ram 1500 at Homestead Meats company. Hilbers departed Homestead

Meats with a female identified by Detective Brewer as Haley Rhodes. Agents maintained

surveillance of Hilbers and Rhodes as they traveled eastbound on 3rd St to Hartig Drive. Hilbers

and Rhodes then drove southbound on Hartig Drive and made an abrupt U-turn and began

traveling back northbound.

32.     At approximately 1:25 pm, agents observed Hilbers' truck at 1670 3rd St, Delta,

CO.

33.     At approximately 1:45 pm, Agent Greg Hill observed as Hilbers and Rhodes were

traveling westbound on 3rd away from the residence. Agents maintained surveillance of Hilbers

and Rhodes until they arrived back at Homestead Meats. Detective Brewer observed as Rhodes

was outside the vehicle at the passenger side and appeared to be talking with Hilbers.

34.     At approximately 1:55 pm, Detective Brewer then observed as Rhodes entered the

back seat of Hilbers' vehicle.

35.     At approximately 2:06 pm, Detective Brewer observed as Rhodes exited the vehicle and entered back into Homestead Meats. Hilbers departed and agents maintained surveillance until he arrived back at 1670 3rd St, Delta, CO at approximately 2:11 pm.

36.     Sgt. Rumbaugh observed a blue Pontiac sedan at the residence bearing CO license plate AZB-G53 which listed to Richard Gomez and Erica Tuck of 756 1630 St, Delta, CO.

37.     At approximately 2:28 pm, SA Greenfield drove by the residence and noticed that the blue Pontiac was no longer at 1670 3rd St, Delta, CO but that Hilber's truck was still in the driveway and a blue Chrysler Pacifica had also arrived and was parked in the driveway. SA Greenfield observed that the Chrysler Pacifica was occupied by a driver and passenger and both were just sitting in the vehicle and not entering the house. The blue Chrysler Pacifica was bearing CO license plate BDL-W61 which listed to Cassandra Woods and Kyria Trujillo-Davis of 2210 Devon St, Montrose, CO.

38.     At approximately 2:36 pm, the blue Chrysler Pacifica departed, and surveillance was not maintained.

39.     At approximately 2:50 pm, Hilbers departed the residence and traveled to Hartig Drive where he traveled southbound on Hartig Drive. In the area of Hartig Drive and 1740 Rd, Hilbers made another abrupt U-turn and began traveling back northbound. Agents maintained surveillance until Hilbers arrived in the area of Hartig Drive and G40 Lane where surveillance was lost temporarily. Agents observed that during this time frame Hilbers appeared to be the only occupant of the vehicle. A short time later, Agent Chance Davidson observed that Hilbers was located near the Safeway gas pumps and now had a passenger in the vehicle. Agent Davidson observed as Hilbers then departed the Safeway parking lot with the unknown passenger. Surveillance was lost at this time.

40.     SA Greenfield drove back to 1670 3rd St, Delta, CO and observed as the blue Chrysler Pacifica was back at the residence with two occupants who were still in the vehicle.

41.     I believe based upon the above surveillance that Hilbers had departed the TARGET RESIDENCE and was utilizing his vehicle to conduct several drug transactions. Hilbers made several U-turns in a town he is very familiar with and appeared to be driving in a manner in which he was attempting to locate law enforcement surveillance units. In addition, Hilbers made several trips to 1670 3rd St, Delta, CO which agents believe to be a low-level distribution point for heroin and methamphetamine.

42.     On July 2, 2021, Detective Clint Swope of the Delta PD conducted a trash run at 1670 3rd St, Delta, CO and obtained numerous used syringes believed to be utilized for heroin use, burnt aluminum foil, and a used glass pipe with methamphetamine residue.

### June 23, 2021 Controlled Purchase of Methamphetamine and a Firearm

43.     On June 23, 2021, at approximately 2:43 pm, SA's Flanagan, Greenfield, Scott, and DCSO Detective Brewer met with CS-1 at a neutral location to prepare for a controlled purchase operation from Lonny Hilbers.

44.     At approximately 2:48 pm, SA Flanagan conducted a debriefing of CS-1. CS-1 stated that he/she had recently been in contact with Hilbers. CS-1 stated that Hilbers had confirmed the price for the four ounces as $1500. CS-1 provided phone number 970-250-9615 as Hilbers' phone number.

45.     SA Scott searched CS-1 for money, drugs, or contraband as witnessed by SA Flanagan. This search was met with negative results. SA Greenfield conducted a search of CS-1's vehicle for money, drugs, or contraband as witnessed by SJDDTF Sgt. Brian Rumbaugh. This search was met with negative results.

46.     At approximately 2:59 pm, SA Flanagan assisted CS-1 in placing a recorded call to Hilbers. SA Flanagan observed that the phone and had a contact number of 970-250-9615. CS-1 had limited connectivity at this time and a relevant call could not be obtained. SA Flanagan equipped CS-1 with a covert recording device at this time. SJDDTF Sgt. Brian Rumbaugh and SA Greenfield equipped CS-1 with a covert recording and transmitting device, which was monitored by SA Jason Greenfield for the duration of the controlled purchase. SA Flanagan provided CS-1 with $2,000 of DEA official advanced funds. SA Flanagan provided CS-1 with $1,500 of SJDDTF recorded funds. At approximately 3:15 pm, CS-1 departed the neutral location, followed by law enforcement. CS-1 made no stops in route to Hilbers' residence (8281 Highway 65, Delta, CO).

47.     Law enforcement observed that Hilbers' vehicle (red Ram 1500) was at the residence, 8281 Highway 65, Delta, CO, prior to the arrival of CS-1. At approximately 3:22 pm, CS-1 arrived at 8281 Highway 65, Delta, CO. At the time CS-1 arrived, Hilbers was in his vehicle in the driveway of the residence. CS-1 met with Hilbers in the driveway of his residence, and agents observed as Hilbers exited his red Ram 1500 with a package in hand and made contact with CS-1. SA Greenfield overheard the money being counted and discussion of the gun transaction between CS-1 and Hilbers.

48.     At approximately 3:25 pm, CS-1 departed Hilbers' residence at 8281 Highway 65, Delta, CO (TARGET RESIDENCE) and was followed by law enforcement to the neutral location. Shortly after CS-1 departed, Hilbers' departed from the driveway of the residence as well and traveled into the city of Delta, CO in his red Ram 1500.

49.     At approximately 3:32 pm, law enforcement met with CS-1 at a neutral location to conduct a debriefing of the controlled purchase. CS-1 relinquished approximately four ounces

of suspected methamphetamine to SA Greenfield. The methamphetamine was later field tested by SA Greenfield which tested presumptive positive for the presence of methamphetamine. CS-1 relinquished the firearm, identified as a Ruger LCP .380 handgun, to SJDDTF Sgt. Rumbaugh. Sgt. Rumbaugh observed that the handgun had a magazine inserted into the magazine well. Sgt. Rumbaugh rendered the weapon safe for officer safety, at which time he observed that the magazine had ammunition loaded into it but did not have ammunition loaded into the chamber. At approximately 3:33 pm, SA Flanagan conducted a debriefing of CS-1 at this time as witnessed by SA Scott. CS-1 stated that Hilbers called CS-1 three times while in route to Hilbers' residence. CS-1 stated that Hilbers was anxious and wanted CS-1 to hurry. CS-1 arrived at the residence and met Hilbers in the driveway. Hilbers gave the gun and methamphetamine to CS-1, wrapped in newspaper. CS-1 stated that Hilbers then agreed to $1500 for the four ounces of methamphetamine and $500 for the firearm, for a total of $2,000. CS-1 stated that he/she gave Hilbers $2,000 of the official advanced funds.  CS-1 stated that no other individuals were with Hilbers at this time. CS-1 departed Hilbers residence.

50.     SA Scott searched CS-1 for money, drugs, or contraband as witnessed by SA Flanagan. This search was met with negative results. SA Greenfield searched CS-1 vehicle for money, drugs, or contraband as witnessed by SJDDTF Sgt. Rumbaugh. This search was met with negative results.

51.     ATF SA Ben Byrd conducted a function test of exhibit N-4 and determined that the weapon functioned as designed. SA Byrd observed that there were ten rounds of ammunition loaded into the magazine.

52.     I believe based upon the above controlled purchase, surveillance by agents, and debriefing CS-1 that Hilbers departed his residence of 8281 Highway 65, Delta, CO with the

methamphetamine and firearm that had been requested by CS-1, entered his red Ram 1500 and

met with CS-1 in the driveway of the residence. I believe that during this controlled purchase

operation Hilbers was utilizing both his residence and his vehicle for the purpose of facilitating

his drug trafficking activities.

## SEIZURE AND SEARCH OF ELECTRONIC DEVICES

53. In this affidavit, the terms computers, or digital storage media or devices are intended to

include any physical object upon which computer data can be recorded as well as all types of

electronic, magnetic, optical, electrochemical, or other high speed data processing devices

capable of performing logical, arithmetic, or storage functions, including desktop and laptop

computers, mobile phones, tablets, server computers, network hardware, hard disks, RAM,

floppy disks, flash memory, CD-ROMs, and other magnetic or optical storage media.

54. I submit that if computers or storage media are found at the areas described above and in

Attachment B, there is probable cause to search and seize those items for the reasons stated

below.  Some of these electronic records might take the form of files, documents, and other data

that is user-generated.  Some of these electronic records, as explained below, might take a form

that becomes meaningful only upon forensic analysis.  I am aware that modern cellular

telephones, or smart phones, operate in many respects as a computer, with internet access, and

function at times as a person's computer historically would have.

55. Based on my own and my colleagues' knowledge, training, and experience, I know that a

powered-on computer maintains volatile data.  Volatile data can be defined as active information

temporarily reflecting a computer's current state including registers, caches, physical and virtual

memory, network connections, network shares, running processes, disks, and printing activity.

Collected volatile data may contain such information as opened files, connections to other

computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of

programs loaded in memory that would otherwise go unnoticed.  Volatile data and its

corresponding evidentiary value is lost when a computer is powered-off and unplugged.

56. Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been downloaded

onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a

storage medium can be stored for years at little or no cost.  Even when files have been deleted,

they can be recovered months or years later using forensic tools.  This is so because when a

person "deletes" a file on a computer, the data contained in the file does not actually disappear;

rather, that data remains on the storage medium until it is overwritten by new data.  Therefore,

deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in

space on the storage medium that is not currently being used by an active file—for long periods

of time before they are overwritten.  In addition, a computer's operating system may also keep a

record of deleted data in a "swap" or "recovery" file.

57. Also, again based on my training and experience, wholly apart from user-generated files,

computer storage media—in particular, computers' internal hard drives—contain electronic

evidence of how a computer has been used, what it has been used for, and who has used it.  This

evidence can take the form of operating system configurations, artifacts from operating system or

application operation, file system data structures, and virtual memory "swap" or paging files.

Computer users typically do not erase or delete this evidence, because special software is

typically required for that task.  However, it is technically possible to delete this information.

Data on the storage medium not currently associated with any file can provide evidence of a file

that was once on the storage medium but has since been deleted or edited, or of a deleted portion

of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

58. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how electronic devices were used, the purpose of their use, who used them, and when.

59. The analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices.  Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

60. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at the location described in Attachment A.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence

(and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

61. I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the locations.

62. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted

or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

63. Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment.  This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment.  This is true because of the following:

   a.   The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

   b.   The volume of evidence and time required for an examination.  Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires

considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

e.   Need to review evidence over time and to maintain entirety of evidence.  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches.  I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant

issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed.  The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum.  Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachment A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of

the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

64. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

65. Because several people may share the area described in this affidavit, it is possible that the area will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

66. I know from training and experience that digital storage devices can be very large in capacity, yet very small in physical size.  Additionally, I know from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime.  The storage capacity of such

devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs and text documents.  Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

## CONCLUSION

67. Based on the above, I believe that there is probable cause that Hilbers has violated federal criminal code Title 21 United States Code, Sections 841 and 846.  I further believe, based upon controlled purchases of methamphetamine and firearms, surveillance, and speaking with CS-1, that Hilbers is utilizing his residence as both a stash location for drugs and guns prior to distribution.

68. Based on the foregoing facts and information, my training and experience, and through discussions with other investigators, I believe there is probable cause to find that the locations described in Attachment A, attached hereto and incorporated herein by reference, will contain the items set forth in Attachment B, and probable cause exists to search the locations described in Attachment A for the items described in Attachment B.  These items constitute evidence of the commission of criminal offenses and are contraband, fruits of the crime, things otherwise criminally possessed, and property designed or intended for use, or that is or has been used, as the means of committing the criminal offenses of Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy to manufacture, to distribute, and to possess with intent to distribute methamphetamine).

I, Jason R. Greenfield, a Special Agent with the DEA, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

Respectfully submitted,

*s/ Jason R. Greenfield*
Jason R. Greenfield
Special Agent
Drug Enforcement Administration

Subscribed, attested to, and acknowledged by reliable electronic means on July ___6___, 2021.

_____
GORDON P. GALLAGHER
UNITED STATES MAGISTRATE JUDGE

Affidavit was reviewed and is submitted by AUSA Pete Hautzinger on July 6th, 2021.